BENBROOK LAW GROUP
BRADLEY A. BENBROOK (SBN 177786)
400 Capitol Mall, Suite 1610
Sacramento, CA  95814
Telephone: (916) 447-4900
Facsimile:  (916) 447-4904

DLA PIPER LLP (US)
DAVID A. CHEIT (SBN 121379)
400 Capitol Mall, Suite 2400
Sacramento, CA  95814
Telephone: (916) 930-3200
Facsimile:  (916) 930-3201

Special Counsel for Appellee and
Cross-Appellant David Flemmer,
Chapter 11 Trustee

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re CWS Enterprises, Inc., a California Corporation,<br><br>                          Debtor. | Case No. CIV S-12-0142 KJM<br><br>Bankr. Court Case No. 09-26849-C-11<br><br>Adv. Proc. Case No. 10-02226-C |
| Spiller McProud,<br><br>                          Appellant,<br><br>v.<br><br>CWS Enterprises, Inc., a California Corporation, David D. Flemmer, Chapter 11 Trustee, and Charles W. Siller,<br><br>                          Appellees.<br><br>AND CONSOLIDATED APPEALS AND CROSS-APPEALS. | APPELLEE AND CROSS-APPELLANT DAVID FLEMMER'S REPLY BRIEF ON CROSS-APPEAL<br><br><br>Trial Date: December 19, 2011<br>Entry of Final Judgment: January 5, 2012 |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................... 1

II.    DISCUSSION ........................................................................................................ 3

    A.    The Arbitrator's Ruling On Unconscionability Did Not Include Or Even Imply A Ruling On Reasonableness ......................................................... 3

    B.    The Reasonable Value Of Spiller's Services Could Not Be Determined, As A Matter Of Law Or Common Sense, Until The Services Called For In His Fee Agreement Were Actually Rendered – Or, In Spiller's Case, Not Rendered ................................................................................................. 6

    C.    Spiller's Claim That The Bankruptcy Court "Ignored" The Terms Of His Contingent Fee Agreement Is Obviously Wrong ....................................... 8

        1.    The court considered the terms of Spiller's agreement ............................. 8

        2.    Spiller misapplies *Landsing* ................................................................. 10

    D.    Spiller's New Contention That *Placide* Improperly Relies On The Published Siller Opinion Is Misplaced ....................................................... 11

    E.    Spiller's Bombastic Conclusion Captures The Essence Of The Equities That Require Denial Of The Windfall That He So Desperately Seeks ................ 13

III.    CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES**

*Connolly Futures Trading Comm. v. Weintraub*,
    471 U.S. 343 (1985) .................................................................................................. 14

*Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*,
    187 Cal.App.4th 1405 (2010) ..................................................................................... 4

*Fergus v. Songer*,
    150 Cal.App.4th 552 (2007) ....................................................................................... 6

*In re Gutierrez*,
    309 B.R. 488 (Bankr. W.D. Tex. 2004) ................................................................... 13

*In re Mednet*,
    251 B.R. 103 (9th Cir. B.A.P. 2000) .......................................................................... 7

*In re Molten Metal Tech., Inc.*,
    289 B.R. 505 (Bankr. D. Mass. 2003) ........................................................................ 7

*In re NWFX, Inc.*,
    267 B.R. 118 (Bankr. W.D. Ark. 2001) ................................................................... 14

*In re Placide*,
    459 B.R. 64 (9th Cir. B.A.P. 2011) ........................................................... 7, 11, 12, 13

*In re Rinard*,
    451 B.R. 12 (Bankr. C.D. Cal. 2009) ......................................................................... 5

*In re Siller*,
    427 B.R. 872 (2010) .................................................................................. 5, 11, 12, 13

*In re Unitcast, Inc.*,
    214 B.R. 992 (Bankr. N.D. Ohio 1997), *aff'd*, 219 B.R. 741 (6th Cir. B.A.P. 1998) ............... 6

*In re Vebeliunas*,
    231 B.R. 181 (Bankr. S.D.N.Y. 1999) ..................................................................... 14

*In re XO Commcns., Inc.*,
    398 B.R. 106 (Bankr. S.D.N.Y. 2008) ....................................................................... 6

*Ketchum v. Moses*,
    24 Cal.4th 1122 (2001) ............................................................................................... 4

*Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co. of Tulsa* (*In re Western Real Estate Fund, Inc).*,
    922 F.2d 592 (10th Cir. 1991) ..................................................................... 1, 8, 10, 11

*Pepper v. Litton*,
 308 U.S. 295 (1939) .................................................................................................................. 5

*Sticka v. Geller* (*In re Stratton*),
 299 B.R. 616 (Bankr. D. Or. 2003) ....................................................................................... 13

**STATUTES**

11 U.S.C. § 330 ............................................................................................................................. 7

11 U.S.C. § 330 (a)(3) ................................................................................................................... 7

11 U.S.C. § 502(b)(4) ............................................................................................................ passim

11 U.S.C. § 704(a)(5) .................................................................................................................. 14

**OTHER AUTHORITIES**

4 *Collier on Bankruptcy*, ¶ 502.03[5](c) and 502.03[5](c)[I] (Alan M. Resnick & Henry J.
 Sommer, eds., 16th ed. 2009) ................................................................................................. 13

Rules of Professional Conduct, Rule 4-200(B) ..................................................................... 3, 4, 7

Rules of Professional Conduct, Rule 4-200(B)(1) ................................................................... 4, 7

Rules of Professional Conduct, Rule 4-200(B)(5) ........................................................................ 7

Rules of Professional Conduct, Rule 4-200(B)(10) ...................................................................... 7

Appellee and cross-appellant David D. Flemmer, Chapter 11 Trustee ("Trustee"), respectfully submits his reply brief on his cross-appeal, formerly captioned as Case No. CIV S-12-0343 KJM and now consolidated with the above-captioned action.

## I.  INTRODUCTION

The sole issue on this cross-appeal is whether the bankruptcy court abused its discretion by determining the reasonable value of services rendered by appellant and cross-respondent Spiller McProud ("Spiller") to debtor Charles Siller to be $440,250. The Trustee's opening brief on the cross-appeal established that the reasonable value of Spiller's services was zero, and that the bankruptcy court did abuse its discretion by finding otherwise, for the following reasons:

<u>First</u>, the documentary evidence and Spiller's own testimony showed that Spiller utterly failed to do what he was hired to do under his contingent fee agreement, and thus there was no basis for setting the contractual contingent fee as a reasonable fee under 11 U.S.C. § 502(b)(4). Spiller assured Mr. Siller in that agreement that he would serve as Mr. Siller's general counsel, and not as an additional member of the Cotchett, Pitre & McCarthy ("Cotchett") litigation team that Mr. Siller was paying separately to handle the dissolution action. Yet Spiller promptly ignored the fee agreement he drafted, and he spent nearly all of his time tagging along with the Cotchett team on litigation tasks that were plainly within the scope of Cotchett's separate agreement with Mr. Siller – and just as plainly outside the scope of services he set out for himself in his own agreement.

Indeed, Spiller avoided his duty to serve as Mr. Spiller's personal counsel – as an "interface" with the Cotchett team rather than a member of the Cotchett team – so completely that he actually joined Cotchett in demanding a premature payment of their fees and his fees, instead of advising Mr. Siller that no fees were owed under either of the contingent fee contracts, as Cotchett had not resolved the fee claims by Mr. Spiller's other former attorneys. The direct consequences of Spiller's failure to fulfill his "general counsel" duties were that the settlement of the dissolution action was derailed and all of Mr. Siller's former lawyers stampeded to the courts – with Cotchett and Spiller leading the charge – directly forcing Mr. Siller into the protracted, contentious, and costly bankruptcy case that has culminated in this appellate proceeding.

  <u>Second</u>, the opinion testimony of the Trustee's expert witness, James Wagstaffe, confirmed that while Spiller might have a claim against Cotchett for work done as a member of the Cotchett team under the "associate counsel" provision of Cotchett's fee agreement, the reasonable value of Spiller's work for Mr. Siller was zero because of his failure to fulfill his duties as "general counsel" to Mr. Siller under his own fee agreement.

  <u>Third</u>, the bankruptcy court improperly relied on the fact of the Cotchett compromise in the underlying bankruptcy proceeding as the only reason not to agree with Mr. Wagstaffe's assessment of the evidence. The court appeared to otherwise accept Mr. Wagstaffe's conclusion in its entirety, finding it to be "sufficiently powerful that I might get reversed for deviating from it." (Jan. 3 Trans. at 51:20-52:4). Moreover, as the court correctly acknowledged during the trial, when Spiller absurdly claimed that evidence of other attorney-claimants' settlements was admissible as the law of the case: "the fact of compromise is [not] probative of section 502(b)(4)" reasonableness. (Dec. 19 Trans. 117:13-15.) That observation was correct as applied to Spiller's "law of the case" argument, and it is equally correct as applied to the allowance of Spiller's claim. The fact that Cotchett compromised its own claim in the bankruptcy case in 2011, without Spiller's participation, is entirely irrelevant and may not properly be considered as a factor in determining the reasonable value of work performed by Spiller as Mr. Siller's supposed "general counsel" between 2004 and 2007.

  In summary, the Trustee's brief showed that every dollar of the bankruptcy court's allowance to Spiller was based on its consideration of a legally improper factor, the entire allowance therefore constitutes an abuse of discretion, and the bankruptcy court's judgment should be reversed with instructions to disallow Spiller's claim in its entirety.

  Spiller's burden in opposition to the Trustee's cross-appeal was to demonstrate a legal and factual basis on which the bankruptcy court's allowance should be affirmed. However, the brief that Spiller filed on October 30, 2012, for all its venom and vitriol, is silent not just on each of the above-described points that were established by the Trustee, but on the entire issue of what reasonable value was shown by the evidence at trial. Spiller simply refuses to engage on the merits.

Spiller's brief, which is styled as a combined reply in support of his own appeal and opposition to the Trustee's cross-appeal, expressly incorporates his appellate arguments into his cross-appeal opposition. His self-described "overriding objection" to the judgment is that "the bankruptcy court lacked the authority to conduct the trial for the reasons set forth in this district court's May 10, 2012 opinion." Brief at 7:16-18. Since Spiller cannot seriously question the bankruptcy court's jurisdiction to conduct the trial, given the lack of a stay during the pendency of his then-pending interlocutory appeal, his "objection" necessarily refers to his core argument that the bankruptcy court's consideration of the reasonableness of his fees under section 502(b)(4) was foreclosed by the January 15, 2009 arbitration decision in which his fee agreement with Mr. Siller was ruled not to be unconscionable.

Spiller's contention, initially asserted before the trial and raised again both in support of his appeal and in opposition to the Trustee's cross-appeal, is simply that he is entitled to recover his full claim amount of more than $2.5 million, no matter what the trial revealed about his failure to discharge the duties he set out to undertake in the agreement he says is controlling, and no matter what the evidence showed about the reasonable value of his services. To the extent Spiller deigns to address the actual trial that is the subject of this appeal, he offers nothing that counters the Trustee's showing that the allowance should be reduced from $440,250 to zero.

As discussed below, each of the very few points Spiller offers in opposition is wrong.

## II. DISCUSSION

### A. The Arbitrator's Ruling On Unconscionability Did Not Include Or Even Imply A Ruling On Reasonableness.

As noted above, Spiller's attack on the bankruptcy court's "authority" is nothing more than a repetition of his claim that the arbitrator's decision on state-law unconscionability precluded the bankruptcy court from considering the purportedly identical issue of reasonableness of his fees under section 502(b)(4). However, the two standards are not only far from identical, they are categorically different by definition. No better example of the difference between the two concepts can be found than the very first factor set forth in Cal. Rules Prof. Conduct Rule 4-200(B), the rule that Spiller and this Court have acknowledged sets the standard for evaluating the

-3-

WEST\239832162.1

alleged unconscionability of a fee. *See* May 10 Order at 21-22 (noting Rule 4-200(B) factors applied in *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*, 187 Cal.App.4th 1405 (2010)). The first Rule 4-200(B) factor is: "The amount of the fee *in proportion to the value of the services performed*." Rule 4-200(B)(1) (emphasis added).

The Rule's direct juxtaposition of "the amount of the fee" and "the value of the services performed," and their differentiation by reference to their "proportion," necessarily presumes that those terms identify two different amounts, and further presumes the principle – directly recognized by the arbitrator – that a fee can be unreasonable without being unconscionable. Arb. Award[1] at 21 (supporting conclusion that "Spiller's Fee is Not Unconscionable" with citation to *Ketchum v. Moses*, 24 Cal.4th 1122, 1132 (2001) ("holding a contingent fee contract may properly provide for a greater compensation than would otherwise be reasonable")). The entire purpose of unconscionability analysis, therefore, is not to determine whether a fee is reasonable, but *to assume that the fee may be unreasonable* and to determine whether it is enforceable anyway as a matter of contract law – which is precisely what the arbitrator purported to do. This manifest *difference* between an unconscionability test and a reasonable-value test establishes as a matter of law that when an attorney's fee is adjudged to be valid within the broad standards of unconscionability, the far narrower issue of whether that fee is also reasonable is not "necessarily decided," within the meaning of the issue preclusion doctrine, in the course of that determination.

The arbitrator's failure to apply the relevant Rule 4-200(B) factors even while purporting to determine unconscionability was explained in detail in the Trustee's opening brief. For present purposes, it is sufficient to note that the Rule 4-200(B)(1) factor all by itself establishes the categorical difference between unconscionability and reasonableness, thereby eliminating any possible application of issue preclusion from the first context to the second one – and puts the lie to Spiller's claim that the trustee "has not and cannot make the case" (Brief at 6:13-18) that the two contexts are different. That "case" is conclusively established by that single element of Rule 4-200(B).

---

[1] (As previously noted, the award is in this court's records at ER 222-249 in Spiller's appeal from the summary judgment motion, Case Nos. 10-cv-0779 KJM and 10-cv-0880 KJM.)

WEST\239832162.1                                        -4-

DLA PIPER LLP (US)
SACRAMENTO

**APPELLEE AND CROSS-APPELLANT DAVID FLEMMER'S REPLY BRIEF ON CROSS-APPEAL;
CASE NO. CIV S-12-0142**

Moreover, the bankruptcy court had previously identified two unique bankruptcy-specific factors that by definition would not come into play in a reasonableness determination in other litigation contexts: the interest in "rigorous scrutiny" of "insider dealings," *In re Siller*, 427 B.R. 872, 881 (2010) (citing, *inter alia*, *Pepper v. Litton*, 308 U.S. 295 (1939)), and the interest in "assuring equitable distribution of assets in a collective proceeding." *In re Siller*, 427 B.R. at 885 (identifying the "primary right" at issue in a bankruptcy case); *see also In re Rinard*, 451 B.R. 12, 19 (Bankr. C.D. Cal. 2009) ("At the core of bankruptcy law is the policy of 'obtaining a maximum and equitable distribution for creditors.'"). The arbitrator plainly did not consider either of these interests in a proceeding that, by definition, was neither equitable nor collective, en route to finding that Spiller's contingent fee contract was enforceable.

First, the bankruptcy-specific interest in assuring "maximum and equitable distribution to creditors" could not have arisen during the arbitration because none of Mr. Siller's attorney-creditors other than Cotchett were parties to the proceeding. The fact that settlements with other creditors in this action have left the estate sufficiently solvent at present to pay Spiller's asserted claim in its entirety – assuming, of course, that his asserted claim actually reflected the "reasonable value" of his services, which it does not – says nothing about how the equities of Spiller's claim might have been weighed against the competing claims of all other creditors in a hypothetical earlier proceeding.[2] For present purposes, the fact that no such earlier proceeding ever occurred – and therefore no previous court or arbitrator had occasion to consider an interest in equitable distribution of assets – simply confirms that the issues before the arbitrator and the issues before the bankruptcy court were not identical.

Second, and even more important, the bankruptcy-specific interest in "rigorous scrutiny" of "insider dealings" – which also was not before the arbitrator – is directly and critically implicated by Spiller's record of double-dealing and disregard for his duties. Indeed, now that the

---

[2] Spiller's apparent suggestion that his claim should be subject to less exacting scrutiny because the estate is "highly solvent" is quite remarkable considering the circumstances here. The entire "estate" consists of what is left from what Mr. Siller recovered in the dissolution litigation. Mr. Siller's former contingent-fee lawyers submitted the vast majority of the claims in the case. Thus, to call the estate "solvent" to pay all of the claims assumes, in effect, that the contingent-fee claims should evade scrutiny so long as they do not collectively exceed 100% of the client's recovery – a novel proposition to advance in an equitable proceeding.

full record of Spiller's "service" to Mr. Siller has been aired in a judicial proceeding focused on equity rather than a pure legal claim, it is difficult to conceive of an "insider dealing" more deserving of "rigorous scrutiny" than a multi-million-dollar payment demand that arises, at its essence, from Spiller's abandonment of his client at a moment when a true general counsel would have saved his client from facing this bankruptcy proceeding at all.  The fact that the arbitrator's (albeit erroneous) analysis began and ended with the bare legal enforceability of Spiller's fee agreement, with no occasion to subject Spiller's services to "rigorous scrutiny," only further underscores the enormous differences between the issues in the respective actions, and the complete inapplicability of issue preclusion from the arbitration to the bankruptcy court.

In summary, the arbitrator did not decide, and could not have decided, whether Spiller's fees were reasonable within the meaning of section 502(b)(4).  Indeed, not only was the arbitrator's entire focus on whether Spiller's fees were unconscionable – a completely different test, as shown both herein and in the Trustee's opening brief – but the arbitrator did not even correctly apply the unconscionability test that he purported to apply.  The arbitrator's misunderstanding and misapplication of the case that he cited for his decision (*Fergus v. Songer*, 150 Cal.App.4th 552 (2007), discussed in detail at pages 23:24-26:5 of the Trustee's opening brief), stands entirely disregarded by Spiller.  His refusal to acknowledge the infirmities in the arbitrator's analysis does not make those infirmities any less dispositive here.

### B.  The Reasonable Value Of Spiller's Services Could Not Be Determined, As A Matter Of Law Or Common Sense, Until The Services Called For In His Fee Agreement Were Actually Rendered – Or, In Spiller's Case, Not Rendered.

Spiller objects that the bankruptcy court conducted an "after-the-fact" analysis of the reasonableness of his fees.  (Brief at 8:5-9.)  While Spiller would understandably prefer to focus solely on the fact that he got Mr. Siller to sign a contingent fee agreement, the law says that the reasonable value of Spiller's fees must be determined based on what actually happened.  *See, e.g.*, *In re XO Commcns., Inc.*, 398 B.R. 106 (Bankr. S.D.N.Y. 2008) (court's analysis of reasonableness of compensation sought is not conducted prospectively; rather, bankruptcy court considers reasonableness based on facts that existed when services were rendered); *In re Unitcast, Inc.*, 214 B.R. 992 (Bankr. N.D. Ohio 1997), *aff'd*, 219 B.R. 741 (6th Cir. B.A.P. 1998)

(reasonableness of attorneys' requested fees should be weighed in regard to what appeared reasonable when fees were incurred).

Moreover, Spiller's citation to Rule 4-200(B) of the Rules of Professional Conduct quotes, but somehow fails to recognize, the requirement that even unconscionability is determined as of the time the agreement is entered into "*except* where the parties contemplate that the fee will be affected by later events." (Brief at 9:1-3) (emphasis added). The Rule's nonexclusive list of relevant factors contains three that necessarily contemplate such "later events": "[t]he amount involved and the results obtained," Rule 4-200(B)(5), "[t]he time and labor required," Rule 4-200(B)(10), and – most important of all, as shown above – "[t]he amount of the *fee in proportion to the value of the services performed*[.]" Rule 4-200(B)(1) (emphasis added).

To be sure, the fee agreement is part of the analysis under Section 502(b)(4), but that does not help Spiller since the court found that he did not do what he was hired to do. *In re Molten Metal Tech., Inc.*, 289 B.R. 505, 515 n.24 (Bankr. D. Mass. 2003) (claimed attorney fees were properly subject to denial when incurred on tasks "outside the scope of the firm's employment;" fees were additionally inappropriate because "some of the services were expressly rendered in opposition to the interests of the estate"). Moreover, the test for reasonableness under 11 U.S.C. § 330, which has been adopted as the applicable test under section 502(b)(4), *see In re Placide*, 459 B.R. 64, 73 (9th Cir. B.A.P. 2011), expressly requires an examination of "the nature, the extent, and the value of such services" in light of "all relevant factors[.]" 11 U.S.C. § 330 (a)(3); *see also In re Mednet*, 251 B.R. 103, 108 (9th Cir. B.A.P. 2000) (Section 330 analysis asks "First, were the services authorized?").

Spiller's contention that the reasonable value of services can be determined without looking at those services is certainly consistent with his belief that he is entitled to $2.5 million for deserting his client, but it is not consistent with the law that must be applied to adjudicate his claim. Indeed, it is not even consistent with the law that applies (or, in the case of the Spiller arbitration, was erroneously not applied) to determine unconscionability.

WEST\239832162.1 -7-
**APPELLEE AND CROSS-APPELLANT DAVID FLEMMER'S REPLY BRIEF ON CROSS-APPEAL;
CASE NO. CIV S-12-0142**

DLA Piper LLP (US)
Sacramento

C.   **Spiller's Claim That The Bankruptcy Court "Ignored" The Terms Of His Contingent Fee Agreement Is Obviously Wrong.**

Spiller argues that the bankruptcy court committed a "reversible error" by deciding to "ignore all of (his) contract's terms and substitute its own determination of a reasonable fee." Brief at 8:20-28 (citing *Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co. of Tulsa* (*In re Western Real Estate Fund, Inc).*, 922 F.2d 592 (10th Cir. 1991)). Spiller is wrong, both in describing what transpired in this case and in characterizing *Landsing*.

### 1.   The court considered the terms of Spiller's agreement.

Considering his complete failure to live up to the terms of his fee agreement, Spiller reaches a truly rarefied level of double-speak in claiming that it was actually the bankruptcy court that "ignore[d]" and "disregard[ed]" the terms of that agreement. The entire trial was about the reasonable value of Spiller's services in light of his agreement and what actually happened. Accordingly, *all* of the following facts were in the trial record:

● Spiller's contingent-fee agreement and the Cotchett firm's contingent-fee agreement (which was incorporated into the Spiller agreement). Trustee's Excerpts of Record filed herein on October 9, 2012 ("EOR") 57-71 (Cotchett agreement). EOR 14-16 (Spiller fee agreement), EOR 73-74 (letter to Cotchett confirming Spiller agreement); Dec. 19 Trans. 26:13-19, 67:25-68:12, 69:22-71:1; 72:22-74:10 (Spiller testimony).

● The "associate counsel" provision of the Cotchett agreement – and Spiller's acknowledgement that he neither formalized his role as a member of Cotchett's litigation team nor advised Mr. Siller of Cotchett's duty to pay associate counsel. EOR 66 at § IV(G); Dec. 19 Trans. 79:5-80:6 (Spiller testimony), *id.* at 127:9-128:10 (Wagstaffe testimony).

● The critical contract requirement that the fee claims of former counsel Freidberg, Hauser and Thomas must be resolved before fees are payable to Cotchett or to Spiller. EOR 62-65 at §§ III(E) and IV(B), Dec. 19 Trans. 91:9-24 and 128:11-129:4.

● The important fact that a 30 percent share of Cotchett's 28 percent contingent fee (that is, 8.4 percent of the total) had initially been allocated to Cotchett's original associated counsel, retired Judge Terence Keeley, which meant that Cotchett's actual contingent interest was less

DLA Piper LLP (US)
Sacramento

**APPELLEE AND CROSS-APPELLANT DAVID FLEMMER'S REPLY BRIEF ON CROSS-APPEAL;
CASE NO. CIV S-12-0142**

than 20 percent. EOR 84 (letter to Keeley confirming share); Dec. 19 Trans. 102:24-103:2 (Keeley testimony).

- The range of reasonableness applicable to the contingent fee payable to Cotchett, as opined by Mr. Wagstaffe. Dec. 19 Trans. 143:5-22.

- The extent to which Spiller's actual services fell within the scope of Cotchett's "associated counsel" provision, and the extent to which he failed to perform the "general counsel" duties specified by his own contingent fee agreement. EOR 18-55 (Spiller time records); EOR 76-78 (Cotchett letter threatening withdrawal), EOR 80-82 (Spiller letter threatening withdrawal); Dec. 19 Trans. 30:20-33:13, 37:24-38:5, 39:21-41:19, 91:15-24; 92:9-93:21; 96:7-9 (Spiller testimony); Dec. 19 Trans. 131:8-140:25 (Wagstaffe testimony).

All of these facts, moreover, were directly relevant to Mr. Wagstaffe's opinion of the reasonable value of Spiller's services under his contingent-fee agreement. Contrary to Spiller's characterization, Mr. Wagstaffe most certainly *did not* opine that "what Mr. Siller had actually contracted for was for Spiller McProud to provide legal services in the nature of an associate working for the Cotchett Pitre law firm [and] therefore, Spiller McProud should look to the Cotchett Pitre law firm for any compensation." Brief at 8:9-13. Mr. Wagstaffe did opine that Spiller had functioned as a Cotchett associate and that he should look to Cotchett for compensation for that work. Dec. 19 Trans. 129:13-130:6, 139:16-18. But that conclusion flowed from the fact that Spiller's work for Cotchett was compensable only within the Cotchett agreement, and indeed was the diametric opposite of the "general counsel" role that Mr. Siller had "actually contracted for." Spiller's decision to cast his lot with Cotchett, from his pre-trial and trial work all the way through to his premature and ultimately destructive demand for payment, fully justified Mr. Wagstaffe's conclusion that any value in Spiller's work was a value provided to Cotchett, not to Mr. Siller.

Thus, Spiller's core problem is not that the bankruptcy court "ignored" the terms of his agreement, but rather that the court analyzed whether, as a factual matter, Spiller actually complied with the contractual terms that Spiller wrote and now claims must be honored. And on this score, the court correctly found that Spiller fell woefully short: The court found that Spiller

"participated as a full-fledged member of the trial team" after promising Spiller in his agreement that he would instead stand between Spiller and Cotchett as an interface and general counsel, and therefore, "a good part of [Spiller's compensation], if not all of it, should come out of the Cotchett" fee in light of the associate counsel provision in the Cotchett agreement (and thus the Spiller agreement as well, since it incorporated the Cotchett agreement). Jan. 3 Trans. 51:16-19.

Spiller further suggests that the bankruptcy court's adoption of a straight hourly calculation indicates a failure to consider the contingent-fee provision of his agreement. The record shows that Spiller is mistaken. While the bankruptcy court described its judgment on Spiller's claim as the result of a "lodestar analysis," Jan. 3 Trans. at 51:25-52:1, the record shows that the court repeatedly recognized and considered the contingent nature of the agreement as part of that analysis. *See*, *e.g.*, Jan. 3 Trans. at 38:8-10, 40:3-6, 40:22-23, 43:11-15, 44:21-45:2, 47:22-48:4, 49:19-25. In any event, as shown in the Trustee's opening brief and again herein, the error in the bankruptcy court's decision to allow fees in an amount equal to an hourly fee calculation was not a failure to consider that Spiller's contract provided for a contingent fee; the error was in the court's determination that the Cotchett settlement provided a reason to deviate from Mr. Wagstaffe's fully-supported opinion that the actual reasonable value of Spiller's contingent-fee services was zero.

### 2. Spiller misapplies *Landsing*.

The *Landsing* court observed that "in other settings, where the bankruptcy court has ignored a debtor's *reasonable contingency fee obligation* and, instead, substituted its own determination of a (much lower) reasonable hourly fee, appellate courts have reversed and directed payment in accordance with the terms of the contingency fee agreement." 922 F.2d at 597-98 (emphasis added). Accordingly, the disposition in *Landsing* was not a reversal with instructions to award the claimed contractual contingent fee, but rather a reversal with instructions to *determine* a reasonable contingent fee, because the bankruptcy court had only determined a reasonable hourly fee. The court explicitly recognized, however, that the two figures could, in fact, be the same:

> In short, then, the bankruptcy court asked and answered the wrong reasonableness question (not the right question at the wrong time), and its divergence from the statutorily prescribed analysis may well have cost [the attorney claimant] the benefit of his contingency fee bargain.
>
> We say "may well," because we do not foreclose the possibility that the bankruptcy court properly could deprive [the attorney] of the same benefit under section 502(b)(4) through adherence to the prescribed statutory procedure.

922 F.2d 598 and n.4.

In other words, while Spiller clings doggedly to his arbitration position that his claimed contractual contingent fee is per se reasonable because the mere fact of a contingent-fee element requires an award in the full amount of his claim, *Landsing* does not stand for that proposition. Instead, it stands for the principle that a bankruptcy court determining reasonableness of fees under section 502(b)(4) must consider the contingent nature of the claimant's fee agreement while determining the reasonable value of services rendered under that agreement – and that while the contingent nature of the agreement is a factor, it is by no means determinative.

Whereas the bankruptcy court in *Landsing* asked "the wrong question," 922 F.2d at 598, the bankruptcy court in this case asked the right question but allowed an impermissible factor to sway its answer. The error in this case was not, as Spiller contends, a failure to consider the contingent nature of Spiller's agreement. The error here was the bankruptcy court's determination that its initial and otherwise valid analysis supporting a reasonable fee of zero – in which the contingent nature of the agreement *was* considered – should be skewed in Spiller's favor, to the extent of his full computed lodestar fee, by the legally irrelevant factor of the Cotchett settlement.

### D. Spiller's New Contention That *Placide* Improperly Relies On The Published *Siller* Opinion Is Misplaced.

Spiller additionally contends that the Bankruptcy Appellate Panel's decision in *In re Placide*, 459 B.R. 64, *supra*, which set forth the applicable standard for determining reasonableness of an attorney's prepetition fees under section 502(b)(4), is somehow suspect because it "relied in part" on *In re Siller*, 427 B.R. 872 (Bankr. E.D. Cal. 2010), the bankruptcy

1  court's own published opinion in this action. Brief at 9:19-22. *Placide* does cite the published
2  *Siller* opinion in three places (459 B.R. at 72, 73, 75), but only in the company of two other
3  corroborating authorities in each instance, and Spiller makes no attempt to show how any of the
4  holdings in *Placide* might have varied in the absence of the *Siller* opinion, or to identify any
5  authorities that support any such hypothetically different holding.

6  Moreover, by focusing his ire on *Placide*'s conclusion that section 502(b)(4) applies to an
7  attorney's prepetition fees even on matters unrelated to the bankruptcy, Spiller's claim that
8  *Placide* is compromised by the bankruptcy court's *Siller* opinion exposes two far more
9  fundamental flaws in his effort to raise such an argument on appeal: first, that *Placide*'s
10 discussion of the prepetition fee issue *makes no reference at all* to *Siller*, and second, that the
11 bankruptcy court's opinion in *Siller* could not have been cited by *Placide* on the prepetition fee
12 issue because the summary judgment motion at issue in *Siller* did not raise that issue.

13 The question in *Placide* was whether the bankruptcy court had correctly disallowed an
14 attorney's claim, based on an hourly fee agreement, for $89,000 in prepetition fees, on the ground
15 that the reasonable value of the attorney's services was no more than the amounts that he had
16 already been paid. That question, in turn, required decisions on three specific issues: (1) whether
17 the "reasonable value" standard of section 502(b)(4) applies to an attorney-claimant's prepetition
18 services, (2) whether the attorney-claimant bears the burden of proving reasonableness, and (3)
19 whether the bankruptcy court abused its discretion in disallowing the claim. 459 B.R. at 71.

20 Spiller's brief quarrels only with the first of those three issues. *Placide* held that
21 bankruptcy courts are indeed required to determine the reasonable value of prepetition attorney
22 fees under section 502(b)(4), *id*. at 71-72, and Spiller contends to the contrary that bankruptcy
23 courts should not "believe they have the authority to disregard the terms of an attorney fee
24 contract for legal services performed prior to and unrelated to the bankruptcy, and to decide for
25 themselves the amount of "reasonable fees" the attorney receives under § 502 (b)(4)." Brief at
26 10:18-21. However, while Spiller's brief claims that *Placide* reached its holding by relying on
27 the bankruptcy court's published *Siller* opinion, Brief at 9:21-22, a review of *Placide* shows that
28 its discussion of whether section 502(b)(4) applies to prepetition attorney fees *does not even*

*mention* the *Siller* opinion, but relied instead on three other cases and a leading bankruptcy treatise, all of which predated *Siller*: *Lansding*, *supra*, *In re Gutierrez*, 309 B.R. 488 (Bankr. W.D. Tex. 2004), *Sticka v. Geller* (*In re Stratton*), 299 B.R. 616 (Bankr. D. Or. 2003), and 4 *Collier on Bankruptcy*, ¶ 502.03[5](c) and 502.03[5](c)[I] (Alan M. Resnick & Henry J. Sommer, eds., 16th ed. 2009).  459 B.R. at 71-72.

*Placide* quoted the *Collier* treatise for the principle that section 502(b)(4) applies to claims for an attorney's services "whether or not the services were rendered in contemplation of the filing of the petition or, indeed, whether those services had anything to do with the bankruptcy or the debtor's financial affairs."  459 B.R. at 72.  *Placide* then quoted the following passage from *Gutierrez*, *supra*:

> Section 502(b)(4) applies to *all* claims for attorneys' fees owed by a debtor prior to the filing of the case in which the claim is made, whether that claim be for representing the debtor in a prior bankruptcy case, or for representing the debtor in any other capacity (personal injury, state court litigation, probate matters, tax advice, etc. etc.

459 B.R. at 72, *citing Gutierrez*, 309 B.R. at 493 (emphasis both in original and as cited).

Finally, *Placide* cited *Sticka v. Geller*, *supra*, with the parenthetical notation "same" to indicate that it agreed with *Gutierrez*, and concluded: "Thus, MLF's claim for prepetition attorney's fees falls squarely under section 502(b)(4) and is subject to a reasonableness determination, regardless of the amount to which MLF is entitled under the Engagement Letter."  459 B.R. at 72.

In short, *Placide* confirms the completely uncontroversial proposition that section 502(b)(4) reasonableness analysis applies to pre-petition services, and it did not – and did not need to – cite the bankruptcy court's opinion to do so.  Thus, the "injustice" Spiller perceives in applying Section 502(b)(4) to pre-petition services would presumably "continue to fester" (Brief at 10:23) – in Spiller's views, but nowhere else – even if *Placide* had never been decided.

E. **Spiller's Bombastic Conclusion Captures The Essence Of The Equities That Require Denial Of The Windfall That He So Desperately Seeks.**

In a final outburst of chutzpah, Spiller portrays himself as a victim of wrongdoing by the Trustee.  Spiller invokes the spectre of "an army of lawyers on auto-pilot feasting on (Mr.

Siller's) assets[,]" in reference to the court-approved attorneys who have the duty to defend the estate from his campaign to plunder more than $2.5 million of those assets. (Brief at 11:8-15.)

Spiller misstates the Trustee's role. Among the many duties owed by a Chapter 11 Trustee are the duty "to maximize the value of the estate[,]" *Connolly Futures Trading Comm. v. Weintraub*, 471 U.S. 343, 352 (1985), and, "if a purpose would be served, [to] examine proofs of claims and object to the allowance of any claim that is improper[.]" 11 U.S.C. §§ 704(a)(5); 1106(a)(1) (A Chapter 11 trustee "shall …perform the duties of the trustee, as set forth in [*inter alia*, section 704(a)(5)].") Bankruptcy trustees are officers of the court, and they owe fiduciary duties not only to creditors but to the debtor as well. *In re Vebeliunas*, 231 B.R. 181, 192 (Bankr. S.D.N.Y. 1999); *In re NWFX, Inc.*, 267 B.R. 118, 151 (Bankr. W.D. Ark. 2001) ("The trustee has an absolute obligation to act in the best interest of the estate at all times.").

These solemn obligations compelled the Trustee, upon examination of Spiller's claim, to determine whether it was "improper" within the meaning of section 704(a)(5). The facts adduced by that examination compelled the Trustee to object to Spiller's claim – not just in the interest of preserving assets for distribution to creditors with meritorious claims, but in the interest of enabling CWS Enterprises, Inc. to emerge from bankruptcy pursuant to a viable plan of reorganization. The record at trial conclusively establishes the merit of the Trustee's objection, and the substance and tone of Spiller's objections do nothing but underscore both the correctness and the necessity of the Trustee's efforts in opposition to his claim.

Thus, while Spiller accuses the Trustee of taking an ironic position by opposing him, the irony runs entirely in the opposite direction. Spiller is the attorney who undertook to be Mr. Siller's general counsel. By the very terms of the agreement Spiller drafted, it was his job to protect his client from, among other things, Cotchett's premature fee demand. It was his job to stand up to Cotchett – as the "interface," a term he alone came up with – to tell the firm its fee had not been earned and could not be paid until the other lawyers' fees were determined. It was expressly his job <u>not</u> to act as "an additional trial attorney[]" on the Cotchett team. Instead, it was Spiller who attempted to "feast" on what he knew would be a huge recovery by simply coasting along as an unneeded member of the Cotchett team, performing services that Mr. Siller had

already paid for in his agreement with Cotchett. When the time came for Spiller to do the job he had actually defined for himself in his fee agreement with his client, he abandoned the client and cast his lot with Cotchett. Spiller's treachery led directly to the disintegration of the settlement, the stampede to arbitration and/or court by unpaid attorneys – *led by him* – and Mr. Siller's resort to the protection of the bankruptcy laws to ensure the orderly resolution of claims that remained unresolved solely because Spiller didn't do his job.

Had Spiller actually fulfilled his general counsel duties by handling all of the unresolved fee claims, including Cotchett's – and thereby avoiding the bankruptcy – Spiller's services might even have been worth $2.5 million. His demand to collect that same fee for refusing to fulfill those duties, nearly four years into a bankruptcy proceeding that he caused, is the defining characteristic of this bankruptcy case in general and of the Trustee's cross-appeal in particular.

### III.  CONCLUSION

For all of these reasons, the Trustee respectfully submits that the bankruptcy court's allowance of $440,250 to Spiller is unsupported by the law or the facts, that the reasonable value of Spiller's services to Mr. Siller is zero, as established by the trial record pursuant to section 502(b)(4), and that the bankruptcy court's award judgment should be reversed with instructions to disallow Spiller's claim in its entirety.

Dated:  November 20, 2012      DLA PIPER LLP

By:  /s/ *David A. Cheit*
David A. Cheit
David.Cheit@dlapiper.com
Attorney for David Flemmer, Trustee

Dated:  November 20, 2012      BENBROOK LAW GROUP, PC

By:  /s/ *Bradley A. Benbrook* (authorized 11/20/12)
Bradley A. Benbrook
brad@benbrooklawgroup.com
Attorney for David Flemmer, Trustee